

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**



GERARD W. ATCHISON, SR.,

               Plaintiff,

               v.

SEARS, SEARS HOLDINGS
CORPORATION, SEARS HOLDINGS,
SEARS, ROEBUCK AND CO., and SEARS
HOME IMPROVEMENT PRODUCTS,

               Defendants.

:
:
: ,
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

No. 08-3257



**FILED**

OCT 7 2009

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                            **OCTOBER 7 , 2009**

Presently before the Court are the Motions for Summary Judgment filed by Defendants

Sears, Sears Holding Corporation, Sears Holdings, Sears, Roebuck and Co., and Sears Home

Improvement (collectively "Defendants" or "Sears"). For the following reasons, Sears's

Motions will be granted.[1]

## I.    **BACKGROUND**

### A.    **Introduction**

Gerard Atchison, Sr. ("Atchison" or "Plaintiff") is a former employee of Sears. In

September 2007, while he was employed at Sears, Atchison was diagnosed with rheumatoid

---

[1] On July 24, 2009, Sears filed a Motion for Summary Judgment ("Defs.' First Summ. J.
Mot.") regarding three counts asserted in Plaintiff's original Complaint. Subsequently, on
August 21, 2009, Plaintiff filed his first Amended Complaint ("Amended Complaint") On
August 28, 2009, Sears filed an additional Motion for Summary Judgment ("Defs.' Second
Summ. J. Mot.") regarding a breach of contract claim added in the Amended Complaint. The
Court will address both Summary Judgment motions in this Memorandum.

arthritis. As a result, in or around November 8, 2007, he applied and was approved for short-term disability benefits and leave pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 ("FMLA"). On November 27, 2007, Atchison received a letter from Sears informing him that he was terminated pursuant to a Reduction-In-Force ("RIF") at the company.

On July 11, 2008, Atchison filed a Complaint against Defendants in this Court. Atchison's three-count Complaint set forth claims against Sears for violation of ERISA (29 U.S.C. § 1140), FMLA interference, and FMLA retaliation. During the course of discovery, Atchison learned that Sears's short-term disability plan was self-funded and was not governed by ERISA. As a result, pursuant to this Court's August 17, 2009 Memorandum and Order, Plaintiff was permitted to amend his Complaint to withdraw his ERISA claim and add a breach of contract claim. Atchison v. Sears, No. 08-3257, 2009 WL 2518440 (E.D. Pa. Aug. 17, 2009). On August 21, 2009, Atchison filed his Amended Complaint where he makes the following claims: FMLA interferenec in Count I; FMLA retaliation in Count II; and breach of contract in Count III.

### B. Atchison's Re-employment at Sears

Atchison is a licensed refrigeration and air conditioning repairman. He has been employed off and on by Sears entities throughout his employment history. Most recently, Sears Home Improvement Products'[2] ("SHIP") employed Atchison as a HVAC Project Coordinator at its office in Sharon Hill, Pennsylvania.

Atchison was hired for the Project Coordinator position in July 2005. In that role, his duties included scheduling projects, material management, supervising ongoing projects, and

---

[2] Sears Home Improvement Products is a subsidiary of Sears, Roebuck and Co.

addressing customer service issues. Prior to being hired for this position, Atchison had not

worked for a Sears entity since May 2004. Thus, per SHIP's 2007 Associate Handbook,

Atchison did not receive credit for his prior service time because he was re-employed after more

than a ninety-day gap in service. (Defs.' Mem. Supp. First Summ. J. Mot., Atchison 4 to Ex. B

at 12.)

Significantly, when Atchison rejoined Sears in July 2005 he signed an "All-In-One

Acknowledgment Form" which stated:

> I understand as an associate of SHIPS I am employed under the Employment-At-
> Will doctrine. This means SHIPS does not offer, guarantee, contract, or promise
> employment for any specific length of time. I have the right to leave the
> Company at any time and the Company has the right to terminate the employment
> relationship at any time, with or without notice and with or without cause. . . . *No
> supervisor, department head, or other member of management, except for the
> Senior Leadership Team acting at the direction of the VP/GM, has the
> authority to bind the company to any employment contract for any specific
> period of time with any associate, either verbally or in writing.*

(Defs.' Mem. Supp. Second Summ. J. Mot., Ex. E (emphasis added).) Atchison signed this

document on July 20, 2005, and initialed the section containing this language.

## C.    Atchison's FMLA Leave

There are two different time frames in 2007 when Atchison requested and was granted

FMLA leave. First, from January 18, 2007 through February 12, 2007, Atchison was on FMLA

leave because he underwent surgery for a tumor near his head and neck region

("January/February leave"). Second, on or around November 8, 2007, Atchison formally

requested and was granted additional FMLA and short-term disability leave due to his

rheumatoid arthritis. The FMLA leave granted in November is the one primarily at issue in this

case.

3

At the conclusion of his January/February leave, Atchison was provided with a "FMLA LEAVE EXPIRATION NOTICE" ("FMLA Notice") that: 1) advised him that his FMLA leave entitlement expired on February 12, 2007; 2) notified him that although his rights under the FMLA ceased on February 12, 2007, he was eligible for additional leave under "[s]tate-specific leave as outlined in the Associate Rights Under Sears' Family & Medical Leave Policies"; and 3) advised him that he "will be entitled to job protection for additional leave." (Defs.' Mem. Supp. Second Summ. J. Mot., Ex. G.) The notice identified Atchison by name, was signed by company representative Sarah Frank, and was dated February 13, 2007. (Id.)

Atchison returned to his Project Coordinator position after the January/February leave. Notably, at his deposition, Atchison testified that he did not suffer any consequences at his job from taking this leave in early 2007. (Defs.' Mem. Supp. First Summ. J. Mot., Ex. B at 76:13-76:15.) In September 2007, Plaintiff was diagnosed with the rheumatoid arthritis. Subsequently, on or around November 8, 2007, Atchison again requested and was granted both FMLA leave and short-term disability leave due to his condition.[3]

## D.    SHIP's Reduction in Force

On November 27, 2007, Atchison received a letter advising him that he was terminated because his position had been eliminated pursuant to a SHIP company-wide RIF. Specifically, the letter stated: "Due to current business conditions, we have made some adjustments in our staffing to better fit our current structure. Consequently, we have made the decision to eliminate several positions. This impact has affected you, and your position was eliminated effective

---

[3] Per company policy, Sears's employees are advised to apply for short-term disability benefits when they apply for FMLA leave.

4

November 15, 2007." (Pl.'s Mem. Opp. First Summ. J. Mot., Ex. M.) In connection with the RIF, approximately seventy SHIP employees were laid off or demoted.[4] (Defs.' Reply Mem. Supp. First Summ. J. Mot., Ex. 3; Defs.' Mem. Supp. First Summ. J. Mot., Ex. G at 10:2-10:5.)

As explained by SHIP's Director of Human Resources, Teige McShane ("McShane"), the "November 2007 reduction in force was precipitated by Sears' business needs including the need to save money during a period of reduced revenues" and was "economically motivated." (Defs.' Mem. Supp. First Summ. J. Mot., Ex. H at ¶¶ 6-7.) McShane stated that there were specific criteria established to determine which employees would be laid off according to the RIF. In sum, it was determined that "offices whose headcount supporting a product was greater than necessary would eliminate unnecessary positions managing the products that were overstaffed." (Id. ¶15; see also Defs.' Mem. Supp. First Summ. J. Mot., Ex. J at 28:23-29:4.) Further, "[i]f there was more than one individual managing an overstaffed product, the individual with the most recent service date was subject to inclusion in the reduction in force." (Defs.' Mem. Supp. First Summ. J. Mot., Ex. H ¶16; Ex. J at 28:23-29:4.)

The detailed criteria for the RIF were outlined in a SHIP document produced in this case entitled "Headcount Reduction Selection Criteria." (Defs.' Mem. Supp. First Summ. J. Mot., Ex. 2 to Ex. H.) The criteria dictated that "[p]roduct volume" established which offices and individuals managing the products in these offices were within the scope of a headcount reduction. (Id.) Next, the criteria stated that "[s]ervice" determined which individuals managing a product in a specific office were targeted for termination. (Id.) Specifically, the document

---

[4] Charles Klinzing, SHIP's Regional Human Resources Director for the Northeast Region, was directly involved in the decision to implement a company-wide RIF.

5

stated: "If Criteria #1 is met, the subordinate role managing the product is selected. If there are two in the same job title in the subordinate role, the one with the least service is targeted." (Id.) Finally, the outlined criteria mandated that "[p]erformance" could be considered in the determination. (Id.) The document stated: "If Criteria #1 is met and there is a documented performance issue for the positions in scope, the individual with the performance issue is selected regardless of title or service." (Id.)

Based on the staffing of the HVAC product line at the SHIP office in Sharon Hill, Atchison's position was identified for inclusion in the RIF. Lawrence Hoerner ("Hoerner"), SHIP's Regional Director of Operations for the area covering the Sharon Hill office, made the ultimate decision to include Atchison in the RIF. According to Hoerner, Larry McDowell ("McDowell), SHIP's Vice President of Operations and Hoerner's superior, directed him to implement the RIF in certain locations. In accordance with the aforementioned criteria, Hoerner determined that it was necessary to eliminate one HVAC Project Coordinator position in the Sharon Hill office.

The timing of the decision to include Atchison in the RIF is significant in this case. According to Hoerner, he made the decision to include Atchison in the RIF in September or early October 2007. Hoerner testified that he conferred with Robert Iandoli ("Iandoli"), SHIP's Metro Installation Manager and Atchison's direct supervisor, prior to making the decision. (Defs.' Mem. Supp. First Summ. J. Mot., Ex. L at 22:3-22:11.) Subsequently, Hoerner notified McDowell of his decision to include Atchison in the RIF. On October 17, 2007, McShane (SHIP's Director of Human Resources), sent McDowell an e-mail requesting that McDowell identify the SHIP employees on an attached spreadsheet who were to be included in the RIF.

6

(Defs.' Mem. Supp. First Summ. J. Mot., Ex. H at ¶¶ 8-10; e-mail and attached spreadsheet included as Ex. 1 to Ex. H.) The spreadsheet contained the names of all SHIP installation employees eligible for inclusion in the RIF to allow McDowell to identify the specific employees. (Id. ¶ 9.)

On October 19, 2007, McDowell responded to McShane's request through a return e-mail and attached spreadsheet. On the attached spreadsheet, McDowell notified McShane that Atchison was identified for inclusion in the RIF by typing a "yes" notation next to Plaintiff's name. (Defs.' Mem. Supp. First Summ. J. Mot., Ex. I ¶¶ 7-8; e-mail and attached spreadsheet included as Ex. 1 to Ex. I.). McDowell was not aware of any subsequent changes to the individuals identified for termination according to the RIF. More importantly, there is no evidence in the record that after October 19, 2007 anyone in SHIP management ever considered taking Atchison off the list of individuals scheduled for termination. According to McShane's testimony, the final decision that Atchison would lose his job was made when McDowell returned the spreadsheet to him. (Defs.' Mem. Supp. First Summ. J. Mot., Ex. J at 31:22-31:25.)

In light of his position as Director of Human Resources, McShane reviewed Hoerner's decision to include Atchison in the RIF to validate that it comported with the established RIF and headcount reduction criteria. There were three individuals employed by SHIP as HVAC Project Coordinators in the Philadelphia district: Hector Toledo ("Toledo"), Stan Pryharski ("Pryharski"), and Atchison. According to Iandoli, because Pryharski was the only employee working out of the Scranton, Pennsylvania office, he was not an option for termination due to the fact that he was needed to run that office. Plaintiff does not dispute that Pryharski was not an option for termination because of his unique position. Thus, Atchison and Toledo were the only

7

candidates for RIF termination out of the Sharon Hill office. During his review, McShane verified that Toledo had a service date of April 17, 2005 in contrast to Atchison's July 31, 2005 service date. As a result, McShane determined that Atchison's termination was consistent with the aforementioned RIF and headcount criteria outlining service date as a determining factor.

In connection with their summary judgment briefing, Defendants submitted a verified statement from Hoerner in which he explains that "[s]ubject to the criteria, it was determined . . . that I would need to eliminate one HVAC Project Coordinator position in the Philadelphia district in the Sharon Hill, Pennsylvania office", and "I selected Gerald Atchison to be included in the reduction in force." (Defs.' Mem. Supp. First Summ. J. Mot., Ex. K ¶¶ 5-7.) As previously noted, Hoerner testified that he made the decision to terminate Atchison in September or October. Moreover, the aforementioned spreadsheet is documented evidence that the termination decision was made by at least October 19, 2007. Thus, the decision was made before Atchison requested his November FMLA leave.

Hoerner testified that he did not review Atchison's personnel file prior to making the termination decision. (Pl.'s Mem. Opp. First Summ. J. Mot., Ex. E at 37:17-38:13.) Hoerner stated that he was not aware that Atchison took prior FMLA leave at the time he made his decision. (Defs.' Mem. Supp. First Summ. J. Mot., Ex. L at 37:18-20; see also Ex. K ¶¶ 13-14.) Moreover, Hoerner stated: "Neither Gerard Atchison's November 2007 requests for FMLA leave and short-term disability benefits nor his January and February 2007 FMLA leave played any role whatsoever in his decision to include Gerald Atchison in the November 2007 reduction in force." (Defs.' Mem. Supp. First Summ. J. Mot., Ex. K ¶ 17.)

At his deposition, Hoerner supported his decision to terminate Atchison by citing

performance issues. Hoerner testified he "wanted to choose the person who would make the least impact" and that Atchison "was deferring a lot of his responsibilities to other managers in the HVAC product." (Defs.' Mem. Supp. First Summ. J. Mot., Ex. L at 22:16-25.) Notably, since Atchison was laid off pursuant to the RIF, no additional project coordinators have been hired to fill Plaintiff's former role.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond

9

the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III.   DISCUSSION

Atchison's three-count Amended Complaint sets forth claims for FMLA interference (Count I), FMLA retaliation (Count II), and breach of contract (Count

III). In the instant Motions, Defendants claim they are entitled to summary judgment on all counts. The Court agrees and will now address each of these claims in turn.

### A.   FMLA Interference Claim

The FMLA was enacted by Congress in 1993 to help address problems stemming from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). The FMLA was designed to "balance the demands of the workplace with the needs of families" and "entitle employees to take reasonable leave for medical reasons." Id. § 2601(b); see also Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (finding that one of the "primary purposes of the FMLA [is] to 'balance the demands of the workplace with the needs of families'"). The FMLA attempts to accomplish these purposes in a "manner that accommodates the legitimate interests of employers." 26 U.S.C. § 2601(b)(3).

The FMLA guarantees eligible employees of covered employers a total of up to twelve work weeks of leave per twelve-month period due to the birth or adoption of a child, the need to care for a spouse, son, or daughter because of their serious health condition, or due to the employee's own serious health condition rendering him unable to perform the functions of his position. Id. § 2612(a)(1). Following a qualified absence, an employee is entitled to be reinstated to his or her former position or an equivalent position with equal pay, benefits, and other conditions of employment. Id. § 2614(a)(1).

In Count I of his Amended Complaint, Atchison claims that Defendants interfered with his FMLA benefits. The crux of Atchison's interference claim is summarized in Paragraph 39 of his Amended Complaint where he states: "The defendants interfered with the Plaintiff's rights to obtain FMLA benefits because they discharged him days after he requested and was approved for FMLA leave." (Amend. Compl. ¶ 39.) Pursuant to the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

To prove an FMLA interference claim, "the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." Sommer v. The Vanguard Group, 461 F.3d 397, 399 (3d Cir. 2006). Specifically, a plaintiff must show that: (1) he was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the employer of his intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he was entitled under the FMLA. Mascioli v. Arby's Rest. Group, Inc., 610 F. Supp. 2d 419, 429-30 (W.D. Pa. 2009). As the Third Circuit has explained, "[a]n interference action is not

11

about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Callison, 430 F.3d 117, 119-20 (3d Cir. 2005). Thus, because an interference claim is not about discrimination, a McDonnell-Douglas burden shifting analysis is not required when examining a interference claim like it is when considering a retaliation claim. Mascioli, 610 F. Supp. 2d at 430.

Nevertheless, an employee's rights are limited by a statutory directive that an employee is not entitled "to a right, benefit or position to which the employee would not 'have been entitled had the employee not taken the leave.' Thus, for example, if an employee is discharged during or at the end of a protected leave for a reason unrelated to the leave, there is no right to reinstatement." Yandrisevitz v. H.T. Lyons, Inc., No. 08-1444, 2009 WL 2195139, at *9 (E.D. Pa. July 22, 2009) (citing 29 U.S.C.A. § 2614(a)(3)(B)).

As a preliminary matter, the Court finds that Atchison's FMLA interference claim should be characterized as a FMLA retaliation claim. The difference between the label on the claim is significant because an employer "cannot justify [a FMLA interference action] by establishing a legitimate business purpose for its decision." Callison, 430 F.3d at 119-20. Moreover, liability is not predicated upon discriminatory intent, but rather, is based upon the act of interference itself. Id. at 120.

The Third Circuit, in Conoshenti v. Pub. Serv. Elec. & Gas Co., addressed a similar situation where a plaintiff claimed that his FMLA leave was used by the employer as a negative factor in the decision to discharge him. 364 F.3d 135, 147 (3d Cir. 2004). In that case, the court characterized the claim as a retaliation claim rather than an interference claim. Specifically, it found that "[e[ven though [the controlling United States Department of Labor regulation]

12

appears to be an implementation of the 'interference' provisions of the FMLA, its text unambiguously speaks in terms of 'discrimination' and 'retaliation,' and we shall, of course, apply it in a manner consistent with that text." Id. In addition, other courts within the Circuit have reached the same conclusion. See e.g., Mascioli, 610 F. Supp. 2d at 432-33 ("Plaintiff's interference claim is different . . . because plaintiff claims her right to FMLA leave was interfered with after she requested leave . . . . *Plaintiff's argument with respect to her interference claim is that defendant took an adverse employment action because she requested leave. This is, in essence, identical to her retaliation claim in count two.*") (emphasis added); Yandrisevitz, 2009 WL 2195139, at *9-10.

In this case, Atchison's interferenee claim is identieal to his retaliation claim, and premised on the same allegation that Sears took adverse employment aetion against him because he requested FMLA leave. He cannot escape the McDonnell Douglas analysis to prove his case merely by affixing an "interference" label to one of his duplicative claims. Thus, Atchison's FMLA violation allegations should be analyzed as a retaliation claim.

Nonetheless, even if Atchison's claim is considered under the interference framework, it fails at this stage. As discussed above, an employee's rights under the FMLA are not without limitation. An employee is not entitled "to a right, benefit or position to whieh the employee would not 'have been entitled had the employee not taken the leave.'" Yandrisevitz, 2009 WL 2195139, at *9 (citing 29 U.S.C.A. § 2614(a)(3)(B)). "[I]f the employee is laid off and terminated while on FMLA leave, the employee has no right to reinstatement or the right to continue leave." Mascioli, 610 F. Supp. 2d at 431; see also Moorer v. Baptist Mem'l Health Care Sys., 398 F.3d 469, 488 (6th Cir. 2005) ("'An employee lawfully may be dismissed

13

preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.'")

Here, there is evidence that Sears made the decision to terminate Atchison's employment pursuant to a RIF *at least* weeks before Atchison formally requested FMLA leave. In the context of an interference claim, "'[n]o FMLA violation occurs where an employer has already decided to terminate the employee before the employee requests FMLA leave.'" Reinhert v. Mineral Techs. Inc., No. 05-4203, 2006 WL 4050695, at *13 (E.D. Pa. Nov. 27, 2006). Atchison has not presented any evidence that Sears ever reconsidered or wavered on the decision to include him in the RIF after he was identified on the spreadsheet on October 19, 2007. "[A]n employee cannot prevail on [his] interference claim if the employer 'can establish that it terminated [the employee] for a reason unrelated to [his] . . . exercise [of his] rights under the FMLA.'" Yandrisevitz, 2009 WL 2195139, at *10 (citation omitted).

Based on the timing of the employment decision, it is clear that Atchison would have been dismissed regardless of whether he requested FMLA leave. As such, Atchison has not established that he was wrongfully denied benefits to which he was entitled. Accordingly, Atchison's FMLA interference claim must be dismissed.

**B.    FMLA Retaliation Claim**

Sears also moves for summary judgment on Atchison's FMLA retaliation claim. In order to prove FMLA retaliation, an employee must show that his employer intentionally discriminated against him for exercising an FMLA right. Mascioli, 610 F. Supp. 2d at 431, 433. In the instant case, as there is only *indirect* purported evidence of FMLA discrimination, the

14

Court analyzes the claim pursuant to the burden-shifting analysis adopted by the United States

Supreme Court in McDonnell Douglas v. Green. 411 U.S. 792 (1973); see also Yandrisevitz,

2009 WL 2195139, at *10 ("Where, as here, there is only indirect evidence of a violation of the

FMLA, courts in Third Circuit apply the McDonnell Douglas burden-shifting framework.").

### 1. Prima Facie Case

Pursuant to the McDonnell Douglas analysis, a plaintiff must first establish a prima facie

case of FMLA retaliation by demonstrating: (1) he took FMLA leave; (2) he suffered an adverse

employment action; and (3) there was a casual connection between his leave and the adverse

action. Conoshenti, 364 F.3d at 146. Defendants do not dispute the first two elements of the

prima facie ease. Atchison received approval for FMLA leave in November 2007 and suffered a

clear adverse employment action when he was terminated. As a result, the Court will only

address the casual connection prong.

The Third Circuit has explained that two main factors are relevant in deciding whether

there was a casual link between the leave and the adverse employment action: (1) timing or (2)

evidence of ongoing antagonism. Abramson v. William Patterson Coll. of N.J., 260 F.3d 265,

288 (3d Cir. 2001). Atchison has not offered evidence of any ongoing antagonism associated

with his January/February FMLA leave or November FMLA leave. In fact, as stated above, he

specifically testified that he did not suffer any consequences related to his January/February

absence. (Defs.' Mem. Supp. First Summ. J. Mot., Ex. B at 76:13-76:15.) Moreover, there is no

evidence that he was the target of any ongoing antagonism in the time period between when he

requested his November 2007 leave, and the date when he was formally terminated.

Next, the Court must consider whether the timing between the decision to end Atchison's

15

application for FMLA leave in November and the decision to terminate his employment is indicative of a casual connection. Significantly, courts have found that a plaintiff cannot establish a casual link when the "decision" to take adverse employment action occurred before plaintiff exercised his or her FMLA rights. See, e.g., Burch v. WDAS AM/FM Inc., No. 00-4852, 2002 WL 1471703, at *10 (E.D. Pa. June 28, 2002) ("In the instant case, however, the evidence that the decision to terminate plaintiff was made before he requested or took leave is uncontroverted. One cannot reasonably conclude that plaintiff was terminated for something which occurred after the decision to terminate him was made."); Williams v. Bd. of Educ., No. 07-6997, 2009 WL 140124, at *5 (N.D. Ill. Jan. 21, 2009) ("Since defendants made their decision not to renew plaintiff's employment before she made her FMLA request, she cannot establish an FMLA claim under a retaliation theory.").

As previously emphasized, in this case there is documented evidence that Sears made the decision to terminate Atchison's employment pursuant to a RIF *at least* several weeks before Atchison requested FMLA leave on or about November 8, 2007. (Defs.' Mem. Supp. First Summ. J. Mot., Ex. I at ¶¶ 7-8; e-mail and attached spreadsheet included as Ex. 1 to Ex. I.) Specifically, an internal Sears e-mail dated October 19, 2009 attached a spreadsheet that specifically identified Atchison as one of the SHIP employees who would be laid off pursuant to the RIF. Furthermore, according to deposition testimony from Huerner, he made the decision to terminate Atchison even earlier in September or early October. (Pl.'s Mem. Opp. First Summ. J. Mot., Ex. L at 20.)

As a result, because Sears's decision to end Atchison's employment was made prior to his application for FMLA leave in November 2007, he cannot establish a casual connection to

16

make out a <u>prima facie</u> case of retaliation.[5] At the time of Hoerner's decision, he could not have been aware of Atchison's November request for FMLA leave.[6]

Plaintiff argues that the Court should disregard the October spreadsheet identifying Atchison for termination because "it is not to be believed" and not a final, approved list. First, Atchison has not pointed to any legitimate reason to doubt the credibility of either the spreadsheet or the e-mail attaching the spreadsheet. It is clear from the e-mail and attached spreadsheet, related deposition testimony, and verified statements that the spreadsheet is documentary evidence that Atchison was identified for termination by October 19, 2007. Atchison's complaints about the redacted nature of the spreadsheet are inappropriate at this stage of the litigation. Specifically, if he had issues with how this document was produced, he should have raised them during discovery.

Second, Atchison's arguments regarding the finality of the termination spreadsheet, and the list of SHIP employees identified for termination per the RIF, are not convincing. Atchison argues that the termination list was still being finalized well into November after he requested FMLA leave. Atchison cites the recent case of <u>Zungoli v. UPS, Inc.</u>, from the District Court of

---

[5] The record is devoid of any evidence that Sears had any advance notice prior to November 2007 that Atchison would request additional FMLA leave.

[6] Regarding Atchison's January/February leave, Hoerner testified that he was not aware of the prior FMLA leave at the time he made the decision, and he did not request or review Atchison's personnel file from Human Resources at that time. Further, as previously mentioned, Atchison testified he suffered no adverse consequences from this leave. Finally, Atchison himself cited authority in his summary judgment briefing that supports the conclusion that a greater than six-month gap between a protected leave and an adverse employment action would not satisfy the requisite temporal proximity. (Pl.'s Mem. Opp. First Summ. J. Mot. at 18 n.4 (citing <u>O'Neal v. Ferguson Constr. Co.</u>, 237 F.3d 1248, 1253 (10th Cir. 2001) for finding that "three months [is] not 'very close' and therefore not sufficient evidence of temporal proximity, but one and one-half months [is] 'very close' and therefore sufficient").)

New Jersey, in an attempt to argue that a material issue of fact exists regarding casual connection because the discharge decision was not finalized. No. 07-2194, 2009 WL 1085440 (D.N.J. Apr. 22, 2009). In Zungoli, however, the court emphasized that "emails between management members indicate[d] that another meeting was to be held before the decision to terminate Plaintiff was finalized." Id at 6. Thus, the court found there was a genuine issue of material fact on the causation issue because that particular plaintiff requested FMLA leave before this additional meeting took place to ultimately decide if plaintiff would be terminated.

In contrast, Atehison has not directed the Court to any evidence that Sears ever reconsidered its decision to terminate him after the decision was made in September or October. Further, Atehison has not identified for the Court any specific changes that were made to the termination list after the spreadsheet was sent from McDowell to McShane on October 19, 2009. The fact that the complete list was awaiting final sign-off when Atchison requested FMLA leave does not save him on the causation issue. The evidence indicates that the decision to terminate Atehison was consistent with objective RIF criteria and was made at least several weeks before he requested leave.

Furthermore, regarding the prima facie case, courts have considered inconsistent reasons given by an employer for an employee's termination when analyzing the causation prong. Wilczynski v. Kuhns, No. 04-129, 2006 WL 2645144, at *12 (W.D. Pa. Sept. 14, 2006) ("For example, timing combined with evidence of inconsistent reasons given by an employer for an employee's termination was held to satisfy the causation prong of the prima facie case."); Parker v. Hahnemann Univ. Hosp., 234 F. Supp. 2d 478, 492 n.15 (noting that the plaintiff may still show causation through circumstantial evidence of ongoing antagonism or inconsistent reasons

18

for the employment action even if the timing of events surrounding the action is not "unduly suggestive"). Atchison argues that the reasons given for his discharge have been ambiguous and inconsistent. The Court disagrees.[7]

The evidence is clear and consistent that Atchison was terminated because of a RIF at SHIP. Specifically, SHIP had to reduce headcount in certain offices and eliminate specific positions through demotions and lay-offs for business and economic reasons. The documents, depositions testimony, and verified statements are entirely clear on this front even if certain witnesses did not use the specific words "Reduction-In-Force" when describing the event. Further, Atchison's office and position were objectively chosen for inclusion in the RIF because of the over-staffing of the HVAC product line in that office. Significantly, Atchison's inclusion in the RIF was consistent with objective RIF/headcount reduction criteria. Finally, the validity of Hoerner's decision to include Atchison in the RIF, in light of the relevant RIF criteria, was

---

[7] Atchison appears to suggest that the Court should disregard verified statements submitted by Defendants with the instant Motions based on the "sham affidavit" doctrine. As the Third Circuit has explained, the "doctrine generally 'refers to the trial courts' practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'" In re Citx Corp., Inc., 448 F.3d 672, 679 (3d Cir. 2006) (citation omitted). Atchison argues that the doctrine should be applied here even though the verified statements were submitted by the moving party, and therefore clearly not submitted in an attempt to create an issue of fact – the primary safeguard of the "sham affidavit" doctrine. As an initial matter, Rule 56 of the Federal Rules of Civil Procedure permits the moving party to submit affidavits in support of a summary judgment motion. Fed. R. Civ. P. 56. Further, the statements submitted by Sears are not inconsistent and do not create credibility issues. The verified statements that Atchison highlights throughout his briefing are those by Hoerner and McDowell. As will be discussed infra, McDowell's description at his deposition of SHIP's company-wide employment action, which led to Atchison's termination, is consistent with the "Reduction-In-Force" label he places on the employment action in his verified statement. Also, Hoerner's deposition testimony that he was not aware of Atchison's January/February FMLA leave at the time of the decision is consistent with both his verified statement and deposition testimony that he did not review Atchison's personnel file.

19

verified by other SHIP management.

Atchison is troubled because Hoerner stated at this deposition that "he wanted to choose the person that would make the least impact in negatively affecting [SHIP's] customers and business." (Defs.' Mem. Supp. First Summ. J. Mot., Ex. L at 22:14-22:18.) Hoerner explained that Atchison "was deferring a lot of his responsibilities to the other managers in the HVAC product." (Id. at 22:21-25.) As previously discussed, the "Headcount Reduction Selection Criteria" stated that "product volume" determined the offices and individuals within the scope of a headcount reduction, while "[s]ervice" time and "[p]erformance" were determining factors regarding which candidates would be terminated. In addition, Atchison points out in his briefing that the 2007 SHIP Handbook stated: "Economic or business conditions may create a situation, which makes it necessary to cut back our workforce. Qualifications, job performance, merit, and seniority are some of the guidelines upon which job elimination decisions are made." (Pl.'s Mem. Opp. First Summ. J. Motion., Ex. N at 65.)

The decision to include Atchison in the RIF over the other potential candidate, Toledo, was entirely consistent with the relevant criteria. As verified by McShane, Toledo had a beginning service date of April 17, 2005 in contrast to Atchison's July 31, 2005 initial service date. Thus, it was consistent with the "service" time criteria to terminate Atchison over Toledo. Hoerner's testimony regarding Atchison's "performance" rather than service time was not surprising given that it was also a relevant factor per the criteria and the Handbook cited by Atchison. Moreover, the decision to terminate Atchison pursuant to the RIF was not a "one-man show." Instead, many members of SHIP management were involved. Hoerner was told by his superiors to eliminate a position in the Philadelphia district, he received input from Atchison's

20

direct supervisor, Robert Iandoli, regarding which individual should be terminated, and the Director of Human Resources verified that the decision comported with RIF criteria.

Additionally, Atchison does not provide any legitimate reason that Toledo should have been terminated instead of him. For example, Toledo clearly had more service time than Atchison, and Plaintiff has not pointed to any performance issues with Toledo that made him a more appropriate choice for termination. In sum, the process for terminating Atchison pursuant to the RIF was well-structured, and the reasons for choosing him were consistent with established criteria. Atchison has failed to establish a casual connection for his prima facie case based on the timing of the decision or circumstantial evidence.

### 2. Legitimate Non-Discriminatory Reason

While the Court has found that Atchison has not established a prima facie case, it will still examine the remaining factors in the McDonnell Douglas analysis. According to the framework, "[i]f a plaintiff establishes a prima facie case, a rebuttable presumption arises, and the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action." Yandrisevitz, 2009 WL 2195139, at *11.

At this stage in the analysis, "the burden of production (but not the burden of persuasion) shifts to the defendant. . . ." Maseioli, 610 F. Supp. 2d at 433. The burden on the defendant is "'relatively light'" and the defendant can satisfy this burden by "'introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision.'" Id. (quoting Fuentes v. Perski, 32 F.3d 759, 763 (3d Cir. 1994)).

In the instant case, Sears has met its "relatively light burden." Specifically, Defendants

21

provided the Court with sufficient evidence that Atchison was terminated pursuant to a company-wide RIF at SHIP. As a result, Sears has established a legitimate, non-discriminatory reason for Plaintiff's termination, and has met its burden under the second prong of the McDonnell Douglas analysis.

### 3. Pretext

At the pretext stage, a plaintiff must point to "some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d 759, 764 (3d Cir. 1989). Plaintiff has failed to provide sufficient evidence under either test to meet the pretext burden.

Regarding the first test, in order to offer sufficient evidence to discredit an articulated legitimate non-discriminatory reason, a plaintiff cannot merely show that the employer's decision was wrong or mistaken. Instead, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence'. . . ." Id. (citation omitted). The evidence may be submitted in relation to plaintiff's prima facie case or can be additional evidence submitted to reject the employer's legitimate non-discriminatory reason as pretextual. Id.

Here, "Plaintiff contends that the Defendants did not conduct an actual RIF within the SHIP department" and that "Plaintiff was discharged simply because he sought, requested and was approved for FMLA leave." (Pl.'s Mem. Opp. First Summ. J. Mot. at 24). The Court has

already addressed many of Atchison's pretextual concerns in the section of the Memorandum discussing the prima facie elements under the McDonnell Douglas framework. Specifically, regarding pretext, Atchison focuses on testimony from McDowell where he stated: *"It wasn't a reduction in force.* It was an evaluation of the business plan, to substantiate head count correctly in all districts offices, to manage the business correctly." (Pl.'s Mem. Opp. First Summ. J. Mot., Ex. F at 10:18-21 (emphasis added).)

Atchison essentially argues that a reasonable fact finder could find that Sears's proffered RIF basis for terminating Atchison is "unworthy of credence" because McDowell's testimony allegedly contradicts this reason, and is also allegedly in direct conflict with McDowell's verified statement where he states "[t]he November 2007 reduction in force was precipitated by Sears' need to save money during a period of reduced revenues." (Defs.' Mem. Supp. First Summ. J. Mot., Ex. I ¶ 4.) In response, Sears argues that "Plaintiff's citation to McDowell's testimony for the proposition that there was no reduction in force relies entirely on an out-of-context citation and disregards the substance of the testimony." (Defs.' Reply Mem. Supp. First Summ. J. Mot. at 3.) The Court agrees.

McDowell testified that he "requested his team to evaluate each office based on volume, based on forecasted plans, and review their head count." (Defs.' Reply Mem. Supp. First Summ. J. Mot., Ex. 1 at 12:11-14) Further, he stated that "[i]f they decided to eliminate a head count due to the business plan, then a head count was eliminated." (Id. at 12:16-17.) It is clear based on McDowell's testimony that he was referring to SHIP's elimination of positions or termination of employees for business and/or economic reasons. The label placed on this action is irrelevant and does not create a triable issue regarding pretext. Finally, it is telling that further along in

23

McDowell's testimony there is the following exchange between McDowell and Atchison's counsel:

> Q. But I thought you said earlier that [sic] just about product line?
>
> A. You were referring–I assumed you were referring to the evaluation of head count needed to run a business correctly.
>
> Q. Right. *Under a RIF, reduction in force*; right?
>
> A. Yes. You're now referencing –
>
> Q. Conduct.

(Defs.' Mem. Supp. First Summ. J. Mot., Ex. M at 34:7-13 (emphasis added).) Thus, it is clear that Plaintiff's counsel even understood McDowell's previous description of the employment action as a RIF. Plaintiff has not offered any reasons why a reasonable jury would disbelieve that Atchison was terminated pursuant to a legitimate RIF.

Regarding the second pretext test, "a plaintiff must point to evidence with sufficient probative force that would allow a fact finder to conclude by a preponderance of the evidence that engaging in the protected activity was a motivating or determinative factor in the employment action." Paul v. UPMC Health Sys., No. 06-1565, 2009 WL 699943, at *19 (W.D. Pa. Mar. 10, 2009). Specifically, relevant evidence that should be examined under the test includes:

> (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people who engaged in the same protected activity as plaintiff or has discriminated against other people within another protected class or (3) whether the employer has treated more favorably similarly situated persons who did not engage in plaintiff's protected activity.

Id.

In the instant case, Atchison has not produced any evidence to suggest that Sears previously retaliated against him for FMLA leave or for any other reason. In fact, the evidence is just the opposite as Atchison testified he did not suffer any consequences as a result of his January/February 2007 FMLA leave.

In addition, Atchison has not presented sufficient evidence that Sears discriminated against others who took FMLA leave. Atchison does cite one e-mail that allegedly shows that four people who suffered adverse employment action pursuant to the relevant RIF were on some type of medical leave. Nevertheless, Sears produced documentary evidence that seventy people suffered adverse employment action pursuant to the RIF. (Defs.' Reply Mem. Supp. First Summ. J. Mot., Ex. 3.) The fact that less than six percent of impacted employees were on some type of medical leave is not evidence with sufficient probative force to allow a fact finder to conclude that Atchison's exercise of his FMLA rights was a determining or motivating factor in his termination.

Finally, Atchison has not produced sufficient evidence to establish that Sears treated similarly situated persons more favorably pursuant to the RIF. The only individual that Atchison identifies is Toledo based on the fact that he was in Atchison's position, and was not a member of the relevant protected class because he did not take FMLA leave. However, Toledo was not similarly situated to Atchison in regard to service time – a critical aspect of the RIF criteria. Toledo had a beginning service date of April 17, 2005 in contrast to Atchison's July 31, 2005 beginning service date. Thus, as verified by SHIP's Director of Human Resources, it was consistent with the "service" time RIF criteria to terminate Atchison over Toledo.

In conclusion, Atchison has not produced sufficient evidence for the jury to reasonably

25

believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of his termination. Therefore, Atchison's pretextual arguments fail under both tests, and summary judgment is therefore appropriate with respect to Atchison's retaliation claim.

### C.    Breach of Contract Claim

Sears also moves for summary judgment on the breach of contract claim. In his First Amended Complaint, Atchison avers: "The Defendants guaranteed, agreed and/or contracted with the Plaintiff on the FMLA LEAVE EXPIRATION NOTICE, dated February 13, 2007, that the Plaintiff would be entitled to additional FMLA leave and that he 'would be entitled to job protection for additional leave.'" (Amend. Compl. ¶ 65.) Sears argues that Atchison has not provided sufficient evidence of an employment contract to overcome the at-will employment presumption at the summary judgment stage. The Court agrees.

#### 1.    Employment-At-Will Presumption

"Absent a clear intent to the contrary, all employment relationships in Pennsylvania are considered employment-at-will, meaning that an employer can discharge an employee at any time for any reason." Erdman v. Nationwide Ins. Co., 510 F. Supp. 2d 363, 375-76 (M.D. Pa. 2007). As courts have emphasized, in Pennsylvania "there is a very strong presumption of at-will employment relationships and the level of proof required to overcome this presumption is arduous." Violanti v. Emery Worldwide A-CF Co., 847 F. Supp. 1251, 1258 (M.D. Pa. 1994). Specifically, "[i]n order to rebut the presumption of at-will employment, a party must establish one of the following: (1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4)

an applicable recognized public policy exception." <u>Janies v. AMP, Inc.</u>, 856 A.2d 140, 144-45 (Pa. Super. 2004) (citations omitted).

In this case, Atchison specifically acknowledged the at-will nature of his employment when he rejoined Sears in July 2005. He signed an "All-In-One Acknowledgment Form" which clearly stated:

> I understand as an associate of SHIPS I am employed under the Employment-At-Will doctrine . . . . No supervisor, department head, or other member of management, except for the Senior Leadership Team acting at the direction of the VP/GM, has the authority to bind the company to any employment contract for any specific period of time with any associate, either verbally or in writing.

(Defs.' Mem. Supp. Second Summ. J. Mot., Ex. E.) Atchison signed this document and initialed the specific section with this language. At this stage, Atchison has failed to present sufficient evidence under any of the aforementioned prongs to establish that the FMLA Notice altered the at-will nature of his employment relationship with Sears.

## 2. Agreement for a Definite Duration

The Court must initially examine whether there was an express agreement between the parties for a definite duration that overrode the at-will relationship. A plaintiff must prove the following in order to prevail on a breach of contract claim: (1) the existence of a contract including its essential terms; (2) breach of a duty imposed by the contract; and (3) resultant damages. <u>Walker Co. Inc. v. Excalibur Oil Group, Inc.</u>, 792 A.2d 1269, 1272 (Pa. Super. 2002). As will be discussed, in this case, the Court finds that no separate employment contract was formed to override the at-will nature of the relationship between Atchison and Sears. Thus, the Court will not address the breach of duty or damages elements of the breach of contract claim.

According to Pennsylvania law, a contract is formed "when the parties to it 1) reach a

mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." Weavertown Transp. Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. 2003). As in this case, the existence of undisputed facts with regard to the alleged contract makes the question of a contract's existence a matter of law. Refuse Mgmt. Sys., Inc. v. Consol. Recycling & Transfer Sys., Inc., 671 A.2d 1140, 1146 (Pa. Super. 1996).

### a. Authority to Alter Employment-At-Will Relationship

Before addressing the elements of contract formation, the Court will examine whether the company representative, Franks, who signed the FMLA Notice even had authority to alter the nature of the employment relationship between Sears and Atchison. Atchison signed the "All-In-One Acknowledgment Form" when he joined Sears which clearly stated: "No supervisor, department head, or other member of management, except for the Senior Leadership Team acting at the direction of the VP/GM, has the authority to bind the company to any employment contract for any specific period of time with any associate, either verbally or in writing." (Defs.' Mem. Supp. Second Summ. J. Mot., Ex. E). It is clear Franks lacked any authority to enter Sears or SHIP into a new employment contract with Atchison that changed his employment-at-will status.

First, Franks lacked actual authority to bind Sears to a new employment contract. Actual authority is defined as "[t]he power of an agent to bind its principal where such power derives either from express or implied agreement between the principal and the agent." Black's Law Dictionary 17 (6th ed. 1990). Atchison has not pointed to any evidence that Franks had the express authority to enter into employment contracts, or modify the employment-at-will status of Sears's employees. The fact that she had the ability to sign-off on a Human Resources form like

28

the FMLA Notice did not give her express or implied authority to alter employment relationships in this manner. Further, Atchison was aware of the express limitations on Frank's ability to change his employment status because of the "All-In-One Acknowledgment Form" he signed.

Second, Franks lacked apparent authority to change the nature of Atchison's employment. "'[A]pparent authority exists where a principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent the authority he or she purports to exercise.'" Volunteer Fire Co. V. Hilltop Oil Co., 602 A.2d 1348, 1353 (Pa. Super. 1992) (citation omitted). Importantly, "a third party cannot rely on the apparent authority of an agent to bind a principal if he has knowledge of the limits of the agent's authority." Bolus v. United Penn Bank, 525 A.2d 1215, 1222 (Pa. Super. 1987). In this case, pursuant to the "All-In-One Acknowledgment Form," Atchison had crystal clear knowledge that Franks could not bind the company to a new employment agreement because she was not a member of the Senior Leadership Team. Atchison does not dispute that Franks was not a member of this team. As a result, even as a threshold matter, Franks did not have the authority to alter Atchison's employment-at-will status by signing the form at issue.

### b.    Mutual Understanding

The Court will now examine each element needed to form a valid contract. An enforceable contract "must represent a meeting of the parties' minds on the essential terms of their agreement." Ruthrauff, Inc. v. Ravin, Inc., 914 A.2d 880, 888 (Pa. Super. 2006 ) (citation omitted). As the Pennsylvania Supreme Court has stated, "[i]t is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made. An offer must be intentional, definite, in its terms and communicated, otherwise the minds cannot meet."

29

<u>Morosetti v. La. Land and Exploration Co.</u>, 564 A.2d 151, 152 (Pa. 1989). As courts have emphasized, when examining arguments by employees that employee handbooks and policies created employment contracts, there must be a "clear indication that the employer intends to overcome the at-will presumption." <u>Raines v. Haverford Coll.</u>, 849 F. Supp. 1009, 1012 (E.D. Pa. 1994). Further, on the employee side, the test is whether a reasonable person in the employee's position would interpret the document as illustrating the employer's intent to overcome the at-will relationship and be legally bound by representations in the document at issue. <u>Bauer v. Pottsvillle Area Emergency Med. Servs.</u>, 758 A.2d 1265, 1269 (Pa. Super. 2000).

In the instant case, there is no indication that the Sears intended to alter Atchison's at-will employment through the FMLA Notice. There is nothing written on the form that communicates a change in the nature of Atchison's employment. While somewhat vague, the statement that Atchison "will be entitled to job protection for additional leave" far from evidences a clear intent by Sears to be bound to an alternative employment arrangement with Atchison where he would be entitled to limitless job protection for an indefinite period. Notably, as previously discussed, even the FMLA does not provide such unlimited job protection. A reasonable person in Atchison's position would not have interpreted the document in this manner given the title of the document and its mere notice of Atchison's leave rights.

At most, the document was broadly reciting Atchison's rights according to the FMLA and any applicable Sears policy. (Defs.' Mem. Supp. Second Summ. J. Mot., Ex. H at 68:17-69:24; <u>see also</u> Pl.'s Mem. Opp. First Summ. J. Mot. at 2.). In sum, Atchison has not met his burden of establishing that the parties had the intention and mutual understanding that the document at issue trumped the at-will relationship and created a new employment relationship.

30

###    c.    **Consideration**

Atchison's breach of contract claim also fails because the alleged agreement lacks consideration. "Consideration consists of a benefit to the promisor or a detriment to the promissee." Weavertown Trans. Leasing, Inc., 834 A.2d at 1172. Pennsylvania courts have discussed valid consideration in detail when analyzing cases where employees have claimed that an "implied-in-fact" contract exists that overcomes the presumption of an at-will arrangement. The same type of consideration analysis can be made here.

As courts have stated, "'to ascertain the parties' intent, an important factor to consider is the presence of additional consideration.'" Janis, 856 A.2d at 144-45 (citation omitted). "The presumption of at-will employment may be overcome by a showing that the employee provided additional consideration to the employer and that termination of employment would result in great hardship or loss to the party known to both employer and employee when the contract was made." Bair v. Purcell, 500 F. Supp. 2d 468, 479 (M.D. Pa. 2007). Significantly, courts have only found "additional consideration" when "an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform." Scott v. Extracorporeal, 545 A.2d 334, 339 (Pa. Super. 1988).

In this case, Atchison has merely alleged that the adequate consideration was "[t]he benefit the defendants derived from the Plaintiff was his continued employment." (Pl.'s Mem. Opp. Second Summ. J. Mot. at 9.) In the FMLA Notice, notwithstanding what Atchison would like the Court to believe, Sears certainly did not bargain away the employment-at-will relationship and agree to provide Atchison with limitless job protection for an unidentified time

31

period in exchange for Atchison's continued job service. As a result, there was not a sufficient consideration or a bargained for exchange to form a separate employment agreement in these circumstances.

### d. Clarity of Terms

Finally, Atchison's breach of contract claim must be dismissed because the alleged agreement lacks requisite clarity. "An enforceable contract requires, among other things, that the terms of the bargain be set forth with sufficient clarity." Lackner v. Glosser, 892 A.2d 21, 30-31 (Pa. Super. 2006). Specifically, for a contract to be enforceable, "the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain." Id. at 30.

The FMLA Notice lacks the clarity and definitive terms to be considered a new employment contract that allegedly overrides the presumed and acknowledged employment-at-will relationship. First, Pennsylvania courts have routinely rejected attempts to rebut the employment-at-will presumption in cases where an alleged agreement did not specifically state a definitive term of employment. Scott, 545 A.2d at 336-37. Thus, the FMLA Notice is not a valid contract because of its indefinite duration. Interestingly, Atchison claims that any reasonable person would turn to the FMLA to conclude that the alleged agreement was guaranteeing "job protection" for the calendar year 2007 because FMLA provides up to 12 weeks of leave per year to qualified employees. Thus, Atchison concedes that alleged contract simply incorporates the FMLA's protections. Atchison appears to claim the alleged agreement incorporates the FMLA when it suits his own arguments, but he distances himself from the FMLA when he ignores that the Act does not provide for unlimited job protection. Nevertheless,

32

there is nothing in the FMLA Notice that speaks to a definitive end to the alleged employment

agreement. Further, the contract does not delineate or define material terms (i.e., "job

protection" or "additional leave") as would be needed to create a separate contract that overrides

employment-at-will.[8] In all, Atchison has failed to establish that the parties created an

enforceable agreement for a definite duration.

### 3. Alternatives to Rebut the At-Will Relationship

Along with failing to establish an agreement with a definite duration to override the

employment-at-will presumption, Atchison has also failed to establish that there was: (1) any

agreement specifying that he would be discharged for just cause, (2) any implied-in-fact contract

displaying the exchange of additional consideration, or (3) any applicable public policy

---

[8] Atchison also argues for the first time in his Memorandum in Opposition to Defendants' Second Motion for Summary Judgment that the 2007 SHIP Associate Handbook created an employment contract that trumped the at-will relationship, and provided him unlimited job protection if he took leave. (Pl.'s Mem. Opp. Second Summ. J. Mot. at 14-15.) As an initial matter, the Court is not required to address this claim because it was not included in his complaint, but rather, presented for the first time in the brief. Turner v. McKune, No. 00-3456, 2001 WL 1715793, at *3 n.1 (D. Kan. Dec. 21, 2001). In his Amended Complaint, Atchison bases his entire breach of contract claim on the FMLA Notice. Atchison should have sought to leave to file another amended complaint if he wanted to assert this new claim based on the relevant handbook. Further, the claim itself is without merit. "An employment handbook constitutes a contract enforceable against an employer if a reasonable person in the employee's position would interpret its provision as illustrating the employer's intent to overcome the at-will rule and be legally bound by the representations contained in the book." Hartman v. Sterling, Inc., No. 01-25630, 2003 WL 22358548, at *13 (E.D. Pa. Sept. 10, 2003). In most cases, "explicit disclaimers of contract formation in an employee handbook preclude a breach of contract claim." Id. In this case, the employee handbook at issue contains multiple disclaimers regarding the formation of an employment contract and against overriding the employment-at-will relationship. For example, the first page of the handbook states in bold letters: "This handbook does not affect the employment-at-will policy as stated throughout this associate handbook" and "This handbook is not intended to create any type of contract between the Company and associate." (Pl.'s Mem. Opp. Second Summ. J. Mot., Ex. F.) Thus, Atchison's new claim regarding the handbook is inappropriate at this stage of the litigation and entirely baseless in light of these disclaimers.

exception. Specifically, Atchison has not raised any "just cause" agreement, and the lack of a bargained-for-exchange and consideration in the alleged agreement was discussed above in detail. Further, there is no applicable public policy exception that can save Atchison's case. Notably, the only potential public policy exception that could be remotely applicable is protecting the rights of individuals who exercise their FMLA rights. However, as discussed earlier in this Memorandum, even Atchison's FMLA claims cannot survive summary judgment.

For the reasons set forth above, the Court finds that summary judgment in Sears's favor is appropriate with regard to Atchison's FMLA interference, FMLA retaliation, and breach of contract claims. Accordingly, both of Sears's outstanding Motions for Summary Judgment will be granted.

An appropriate Order follows.

34